UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

United States of America,
Plaintiff,

v.

Timothy Glen Caskey ,

Defendant.

Criminal No. 11-301 (JRT/LIB)

**REPORT AND RECOMMENDATION**

This matter came before the undersigned United States Magistrate Judge upon Defendant's motions to suppress evidence obtained as a result of a search and seizure and to suppress statements made by Defendant during an interview with federal agents. The case has been referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a hearing on February 13, 2012 regarding these motions and both parties' discovery motions in this case.[1] Following an evidentiary hearing regarding the suppression motions at issue, the parties agreed to submit their legal arguments on the motions by written brief.[2] For the reasons outlined below, the Court recommends that all Defendant's motions to suppress be denied.

[1] The discovery motions were the subject of a separate Order. (See Docket No. 43).
[2] [Deleted].

## I. BACKGROUND

### 1. The Search of Defendant's Vehicle

On July 16, 2011, at approximately 6:20 p.m., Officer Derrick Bobo of the New Braunfels Police Department, in New Braunfels, Texas, responded to a call from someone at K&B Auto Sales, a small car dealership, regarding a stolen motor vehicle. Officer Bobo spoke with the only person on duty at the dealership, Mr. Pete Bornkessel, who advised him that at approximately 3:30 p.m. that afternoon a red Chevy pickup truck arrived at the dealership. In the truck were Defendant, who was the driver of the vehicle, and a female passenger. They indicated to Mr. Bornkessel that they had recently moved to the area and were looking to purchase a truck. They then asked to test drive a white 1998 pickup truck. Mr. Bornkessel agreed and requested to make a copy of a driver's license, upon which Defendant provided his driver's license. Mr. Bornkessel made a copy of the license and returned it to Defendant. Before Mr. Bornkessel allowed Defendant and his female companion to leave the lot, he informed them that they needed to return prior to 5:00 p.m., which Defendant agreed to do.

Upon Defendant's eventual failure to return to the dealership, Mr. Bornkessel called the police to report the vehicle theft, shortly after which Officer Bobo arrived at the dealership. During his conversation with Officer Bobo, Mr. Bornkessel requested that the red truck, which Defendant and his female companion had left at the dealership, be removed from the lot. After completing a stolen vehicle affidavit regarding the white 1998 pickup truck, Officer Bobo processed the license plate of the red truck and discovered that the vehicle had been reported as involved in a kidnapping in Minnesota. Then, Officer Bobo contacted the Virginia Police Department, in Virginia, Minnesota, to acquire some additional details regarding the kidnapping

report and also contacted his supervisor to inquire how to further proceed. His supervisor advised him to seize the vehicle and perform an inventory search, pursuant to department policy.

Officer Bobo testified that the police department policy required an officer to perform an inventory search any time a vehicle is towed. The policy required the searching officer to catalog any "high value" items such as cellphones or other technology, by completing a New Braunfels Police Department Towed Vehicle Inventory form, which includes identifying and descriptive information regarding the vehicle and an inventory list of the items found in the vehicle. In this case, Officer Bobo inventoried the vehicle and listed the following items on the form: a black bag and black camera. At the time of the search, the red truck was located on the dealership parking lot, on the side immediately adjacent to the street—merely a few feet away from the street—and there was no enclosure to secure the dealership's lot.

In addition to the black bag and camera, Officer Bobo observed, in plain view, receipts in the center console of the vehicle, and while further searching the vehicle noticed a serrated knife under the driver's side seat. Officer Bobo also observed hair follicles in the seats on both sides and fingerprints on the driver side of the vehicle. He photographed the evidence, seized the items, and completed a New Braunfels Police Department Receipt for Property form to document all the evidence taken. Officer Bobo testified that seizing all of these items, which were in plain view, was in compliance with the police department's inventory search policy.

After securing the high value items and the potential evidence, Officer Bobo called for a truck to tow the vehicle, and prior to towing, he required the tow-truck driver to sign the Towed Vehicle Inventory sheet. While the vehicle was being towed, Officer Bobo personally escorted it to the secured parking lot at the police department; where it remains today.

**2. Defendant's Interview with the FBI**

On August 8, 2011, at approximately 4:30 p.m., Federal Bureau of Investigation (FBI) Special Agents Shawn Owen and Paul Sparke, with the help of the U.S. Marshals and Customs and Border Protection officers, took custody of Defendant at the United States port of entry on the Matamoros Bridge that connects Brownsville, Texas to Mexico. After taking custody of Defendant and handcuffing him, the U.S. Marshals took him to a six-foot by six-foot, windowless administrative office to conduct an initial interview, which ultimately lasted for approximately 30-40 minutes.

At the outset of the interview, Agent Owen asked Defendant if he was feeling fine and whether Mexican officials had treated him appropriately. Defendant indicated no mistreatment and Agent Owen observed no bruises or physical abrasions. At this time, Defendant also indicated that he had been prescribed Seroquel. Agents Owen and Sparke offered Defendant water, food, and an opportunity to use the restroom, all of which Defendant declined.

After identifying themselves, Agents Owen and Sparke advised Defendant of his rights. Specifically, at 5:18 p.m., they provided Defendant with an Advice of Rights form that advised Defendant of the following:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

Agent Owen placed a copy of the form on the table in front of Defendant and advised Defendant that he would read through the list of rights with him. At this moment, Agent Sparke was across the table from Defendant and Agent Owen was approximately two-to-three feet away from Defendant at a 45-degree angle. While Agent Owen was reading the list of rights aloud, Defendant was looking at the form, and it appeared to Agent Owen that Defendant was reading the form. After reading each line, Agent Owen stopped and asked Defendant if he understood what was read to him, to which Defendant responded by nodding affirmatively each time. The bottom of the form required an interviewee's signature to acknowledge that: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." Agent Owen also read this acknowledgment to Defendant and asked if he understood, to which Defendant verbally responded with a "yes." Defendant then signed the form. Agent Owen and Agent Sparke also signed the form to confirm that they witnessed Defendant's signature and noted, on the form, the time of signature as 5:20 p.m. Only after Defendant signed the form did Agent Owen and Agent Sparke begin to interview Defendant.

To this point, Agent Owen perceived Defendant's demeanor as demure: Defendant answered the agents' questions with one word sentences and did not make much eye contact. Defendant was cooperative, at no point did Defendant indicate that he did not understand the questions posed to him, and he answered all questions in a responsive manner.

After Defendant's waiver of his rights, the agents asked Defendant to identify himself and provide his social security number, which Defendant did. At this point, Defendant again shared with Agent Owen that he was prescribed Seroquel for various mental disorders including

schizophrenia. Based on Defendant's behavior—acting calmly and being responsive—and his acknowledgement of the waiver of rights, Agent Owen decided to proceed with the interview.

Agent Owen then began to ask Defendant as to how he arrived in Mexico. Defendant provided that he had driven with his wife from Minnesota to Mexico and that he was trying "to do the right thing with her." Though Defendant was vague about how he was apprehended by Mexican authorities, he explained that they approached him and took him into custody. When asked why he took his wife, Defendant explained, on several occasions, that the voices in his head had told him to take her with him. Defendant also told the agents that she had come with him voluntarily and that he did not know why he was in custody because he believed everything he had done was legal. During questioning, Defendant also requested to write a letter to his wife, which Agent Owen advised him would have to be discussed in the future.

As the interview progressed, and in the course of answering questions regarding how he arrived in Matamoros, Defendant became more confident with the agents and began to engage the agents more and more by leaning forward and making eye contact. Toward the end of the interview, he stopped answering questions in a responsive manner and began to repeat himself; however, he did not appear confused, nor did he indicate that he did not understand the questions posed to him. Soon thereafter, Defendant advised the agents that he did not want to answer any more questions, at which point the agents stopped the interview. The agents then again offered him something to eat and gave him an opportunity to use the restroom, which Defendant accepted.

During the course of the interview, Defendant remained handcuffed, Agents Owen and Sparke wore civilian clothing, and although they were armed, their guns remained concealed at all times. At no point during the interview did Defendant indicate that voices were then speaking

to him at that specific time, nor did he state that he needed his medication at any time during the interview.

## II. DISCUSSION

### 1. The Inventory Search did not Violate Defendant's Fourth Amendment Rights.

Defendant argues that the search of Defendant's vehicle violated his Fourth Amendment rights because it was a warrantless search and a warrant could have been obtained. (Def.'s Mem. in Supp. of Mot. to Suppress [Docket No. 48] at 7).

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)). A lawful inventory search is one of those exceptions. United States v. Frasher, 632 F.3d 450, 454 (8th Cir. 2011) ("[i]nventory searches are one of the well-defined exceptions to the warrant requirement of the Fourth Amendment."); United States v. Marshall, 986 F.2d 1171, 1173-74 (8th Cir. 1993) ("[i]n South Dakota v. Opperman, the Supreme Court defined what has become known as the 'inventory exception' when it held that the police may lawfully conduct a warrantless search of an impounded automobile that is designed to produce an inventory of the vehicle's contents.").

In this case, Defendant does not specifically argue that the police improperly impounded the vehicle. Rather, Defendant's underlying argument for why the search was improper is that Officer Bobo had an improper additional intent to perform the search: instead of merely inventorying the items in the car, his intent was to "aid the investigation of Mr. Caskey."

However, this argument fails on its face because even if true, an intent to investigate while performing a caretaking function pursuant to a standardized police procedure will not invalidate a lawful inventory search. See United States v. Garner, 181 F.3d 988, 991 (8th Cir. 1999) ("[t]he presence of an investigative motive does not invalidate an otherwise valid inventory search."); United States v. Petty, 367 F.3d 1009, 1013 (8th Cir. 2004) ("[t]hat an officer suspects he might uncover evidence in a vehicle, however, does not preclude the police from towing a vehicle and inventorying the contents, as long as the impoundment is otherwise valid."); Marshall, 986 F.2d at 1176 (quoting United States v. Rodriguez–Morales, 929 F.2d 780, 787 (1st Cir. 1991) and explaining that "[a]s long as impoundment pursuant to the community caretaking function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure."). "The central question in evaluating the propriety of an inventory search is whether, in the totality of the circumstances, the search was reasonable." United States v. Kennedy, 427 F.3d 1136, 1143 (8th Cir. 2005). The Court finds that in this case, the search was reasonable.

Officer Bobo did not explicitly state that it was department policy to remove a vehicle parked in a private lot upon the request of the lot owner or their representative, but, on the facts presented, there was little choice for Officer Bobo to do anything but impound the vehicle. Officer Bobo contacted his supervisor to confirm how he should proceed, and his supervisor advised him to seize the vehicle and perform an inventory search. This is not a case involving a scenario where police might find a vehicle parked on private property without any indication as to whether the driver had permission to leave it there. In this case, the vehicle was left on a private lot by a person that had not returned by the time he agreed upon, and the private lot owner, or a representative of the owner, requested that the vehicle be removed from the lot. The

dealership salesman had explicitly instructed Defendant to return to the lot with the vehicle he test drove prior to 5:00 p.m., which Defendant agreed to do. More than an hour-and-a-half had passed since the imposed deadline, and having assumed no responsibility for Defendant's truck, nor granted permission to Defendant for the truck to remain on the private property, it was certainly within the salesman's available choices to request that the vehicle be removed. See Amaro v. Wilson Cnty., 2011 WL 6207930, at *1 (Tex. App. Dec. 14, 2011) (explaining that the Texas Towing and Booting Act permits "a private property tow, which is the tow of a vehicle authorized by a parking facility owner without the consent of the vehicle's owner or operator"). With "no driver available" to remove the vehicle, Officer Bobo had no choice but to tow the vehicle from the lot. See Petty, 367 F.3d at 1012 (upholding the towing of a vehicle from a private lot when no one was available to drive it, even though there was no request from the lot owner to remove the vehicle); United States v. Hall, 497 F.3d 846, 848 (8th Cir. 2007) (upholding the impounding of the defendant's vehicle at the request of a hospital's security officers and upholding the subsequent inventory search of the defendant's vehicle); United States v. Thomas, 73 Fed. Appx. 365, 369 (10th Cir. 2003) (upholding an inventory search of the defendant's car and the decision of the police to impound the vehicle based on their "conclusion that the owner **implicitly** requested that the vehicle be removed from the property"). Because the decision to tow the vehicle in the present case was not made by the police until it was **explicitly** requested by the lot owner or their representative that it be removed, and Defendant has offered no basis to challenge the private property owner's ability to request that the vehicle be towed, the police "did not exercise any discretion or single out the [vehicle which Defendant] had been driving [and abandoned] for special treatment." Marshall, 986 F.2d at 1174.

Although the Eighth Circuit has previously explained that "[s]tandardized police procedures are necessary to 'ensure that the search is not merely a ruse for general rummaging in order to discover incriminating evidence,'" Frasher, 632 F.3d at 454, it cannot be said that the police removal of a vehicle from private property upon the property owner's request can be considered "a ruse for general rummaging." Defendant had voluntarily driven the vehicle onto the lot and the police were not involved at all in leading the vehicle onto the property. There was no evidence presented whatsoever that the vehicle owner was given permission to remain on the property beyond 5:00 p.m. Thus, the decision to impound the vehicle was done "on the basis of something other than suspicion of evidence of criminal activity." Colorado v. Bertine, 479 U.S. 367, 375 (1987).

In response to the property owner's request that Defendant's vehicle be removed from the property, Officer Bobo prepared the vehicle for towing. Pursuant to the police department's policy, he performed an inventory search of the vehicle that included cataloging various items within the vehicle that would be of high value. Because prior to conducting the inventory search of the vehicle Officer Bobo had become aware that the vehicle had been involved in a kidnapping, he also seized and inventoried items that he thought might be of evidentiary value to the investigation. As discussed above, once Officer Bobo had lawfully decided to impound and tow the vehicle, because he was acting pursuant to a department policy in executing an inventory search, whether he had any secondary intent to investigate a crime is immaterial.

At the hearing, Officer Bobo testified that it was department policy to perform an inventory search prior to impounding and towing a vehicle. Though a written department policy was not submitted to the Court, "testimony can be sufficient to establish police procedures." Petty, 367 F.3d at 1012 (explaining that although "[i]t would have been simpler for the

government to present the police department's written impoundment policy," there was no error in the "district court's finding that the department had a standard policy" upon the testimony of the officer).

In this case, Officer Bobo testified that, in compliance with department policy, he completed the Towed Vehicle Inventory form and Receipt for Property form—his purpose was to inventory the high value items in the vehicle prior to having it towed. Although Officer Bobo may have secondarily taken items such as hair follicles and fingerprints, which may not necessarily be considered to be of "high value," in executing a lawful inventory search, nothing prohibits police from seizing such incriminating items in the course of an inventory search. See Marshall, 986 F.2d at 1176 ("when the police conduct inventory searches according to such standardized policies, they may keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search"); Petty, 367 F.3d at 1013 (upholding the seizure of guns during an inventory search of the vehicle defendant was driving prior to towing it, even though the searching officer acknowledged that "part of his motivation in towing the car was to find out whether there were more drugs or cash inside"); Garner, 181 F.3d at 991 (upholding the seizure of "**trash**, cellular phones, books, **oil**, **clothing**, and sports equipment" during an inventory search). Officer Bobo knew that the hair follicles and fingerprints might be potentially incriminating based on the information concerning a reported kidnapping which he received when he contacted the Virginia Police Department. By keeping his eyes open, Officer Bobo was able to observe the items in plain view while conducting the inventory search for high value items. Defendant provides no authority holding that such items, under the circumstances, could not be seized. Thus, the Court finds that it was lawful for Officer Bobo to seize these items. See Sain v. Geske, No. 07-4203 (MJD/AJB), 2008 WL 2811166, at *20 (D. Minn. Jul.

17, 2008) ("if the inventory search was lawful, [the officer] could lawfully seize evidence in plain view which he had probable cause to believe was evidence of a crime.").

Considering all the facts and circumstances of this particular case, the Court finds that the inventory search was reasonable. Therefore, the Court finds that Defendant's motion to suppress any evidence obtained as a result of the inventory search of his vehicle should be denied.

**2. Defendant made a Voluntary, Knowing, and Intelligent Waiver of his Miranda Rights**

Defendant argues that the waiver of his Miranda right was not voluntary, knowing, and intelligent because "[h]e has been suffering from documented mental illnesses for most of his life." (Def.'s Mem. in Supp. of Mot. to Suppress at 4). He argues that although the police knew about Defendant's mental health issues, "[a]t no point did they explore the impact of mental illness on the waiver." (Id.)

A defendant's waiver of his Miranda rights must be made voluntarily, knowingly, and intelligently. Miranda v. Arizona, 384 U.S. 436, 444 (1966). When determining whether a waiver was voluntary, knowingly, and intelligent, the court must inquire into "two distinct dimensions":

> First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

Thus, the court "must examine both 'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.'" United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002) (quoting United States v. McClinton, 982 F.2d 278, 282 (8th Cir. 1992)). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was *involuntary* and not as bearing on the separate question whether the waiver was knowing and intelligent." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (emphasis in original) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether the waiver was voluntary, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." Syslo, 303 F.3d at 866. Defendant does not assert that here any specific condition or procedure coerced him to make the waiver. Rather, Defendant appears to argue that regardless of the procedures employed in questioning the Defendant, because Defendant had a "very lengthy mental health record that goes back many years," his waiver was not voluntary. (Def.'s Mem. in Supp. of Mot. to Suppress at 6). The Court disagrees.

"Although mental condition is relevant to a suspect's susceptibility to police coercion, coercive police activity is a necessary predicate to a finding that a confession was not voluntary within the meaning of the Due Process Clause." United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002). Where "there is no evidence of coercive police activity, [the defendant's] due process claim fails." Id. Although the discussion of voluntariness in Galceran was based on a due process claim, "[t]here is obviously no reason to require more in the way of a 'voluntariness'

inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context." Connelly, 479 U.S. at 169-70; see also United States v. Syslo, 2001 WL 34808712, at *1 n.1 (D. Neb. May 3, 2001) (quoting Connelly and explaining that although the case cited "was not concerned with the voluntariness of a Miranda waiver per se, but rather the voluntariness of a confession under the Fourteenth Amendment, 'there is obviously no reason to require more in the way of "voluntariness" inquiry in the Miranda waiver context.'"); Mann v. Thalacker, 1996 WL 33423405, at *8 (N.D. Ia. Oct. 9, 1996) (citing Connelly and explaining that "[b]ecause the court finds that [the defendant's] confession was voluntary under the Fifth Amendment, it need not separately analyze [the defendant's] Fourteenth Amendment involuntariness claim.").

Furthermore, Defendant's reliance on Fikes v. Alabama, 352 U.S. 191 (1957), and Blackburn v. Alabama, 361 U.S. 199 (1960), is misplaced. In Fikes, the defendant was 27 years old, schizophrenic, highly suggestible, described as "thick-headed," and had pled a defense of insanity. 352 U.S. at 193. Even considering the defendant's reduced mental competence, in finding that the confession procured by law enforcement was not voluntary, the Court placed heavy emphasis on the procedures employed prior to the confessions:

> For a period of a week, he was kept in isolation, except for sessions of questioning. He saw no friend or relative. Both his father and a lawyer were barred in attempts to see him. The protections to be afforded to a prisoner upon preliminary hearing were denied him, contrary to the law of Alabama. He was questioned for several hours at a time over the course of five days preceding the first confession, and again interrogated at length before the written confession was secured.

Id. at 197 (internal citations omitted). Similarly, in finding that Defendant, who was "insane and incompetent **at the time he allegedly confessed**," did not voluntarily waive his Miranda rights, the Court in Blackburn explicitly considered the circumstances surrounding the confession:

> And when the other pertinent circumstances are considered—the eight-to nine-hour sustained interrogation in a tiny room which was upon occasion literally

> filled with police officers; the absence of Blackburn's friends, relatives, or legal counsel; the composition of the confession by the Deputy Sheriff rather than by Blackburn—the chances of the confession's having been the product of a rational intellect and a free will become even more remote and the denial of due process even more egregious.

361 U.S. at 207-08. No circumstances such as those in Blackburn or Fikes exist in this present case.

Agent Owen testified that Defendant was interviewed shortly after being taken into custody by the U.S. Marshals. The entire interview lasted approximately 30 to 40 minutes. At the outset of the interview, the interviewing agents asked if he would like water, food, or to use the restroom. They also asked if he had been treated appropriately while in the custody of Mexican officials, which Defendant acknowledged he was. Prior to beginning any questioning, the agents presented Defendant with a written copy of an Advice of Rights form, which they placed in front of him so that he could follow along as they read it aloud to him. After reading each line, Agent Owen stopped and asked Defendant whether he understood the right read to him—each time, Defendant acknowledged that he understood. Agent Owen also read the waiver at the bottom of the form to Defendant, which provided that: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." To this Defendant verbally responded with a "yes" and signed the form, which both agents witnessed.

There was no evidence that either of the agents had engaged in any coercive tactic or had exhibited threatening behavior. Agent Starke was seated across from the Defendant and Agent Owen was two-to-three feet away from Defendant at a 45-degree angle. Each of them was dressed in civilian clothing, and though the officers were armed, their firearms were always concealed.

Moreover, Agent Owen testified that in the course of the interview, Defendant provided responsive answers, never indicated that any voices were talking to him at that time and never requested any medication. "Even if a suspect has a somewhat diminished capacity to resist coercion due to a mental defect, however, a Miranda waiver will not be invalidated on that basis if there is no evidence of police coercion." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011). In light of all these circumstances, the Court finds that even though defendant may have suffered from prior mental illnesses, nothing, as demonstrated in the record, suggests that his waiver was not voluntary.

Next, the Court turns to the second distinct inquiry: whether the waiver was knowing and intelligent. To satisfy this prong, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Turner, 157 F.3d at 555 (internal quotation marks omitted).

Defendant generally argues that the waiver was not knowing and intelligent because Defendant "had various mental disorders," including schizophrenia, prior to the interview he had voices in his head tell him to take his wife to Mexico, he had been off of his medication for two weeks, "he did not know why he was in custody and did not think that he had done anything illegal." (Def.'s Mem. in Supp. of Mot. to Suppress at 6). Thus, Defendant argues, he "was not in a state in which he could knowingly and intelligently waive his rights." (Id.) The Court again disagrees.

On the record before the Court, there is nothing to demonstrate that, at the time of the interview, Defendant was not capable of providing a knowing and intelligent waiver. In Turner, the court rejected the defendant's argument that "his waiver was not knowing and intelligent because he was impaired by a low I.Q., PCP intoxication, and mental illness." 157 F.3d at 555.

Similar to the defendant in Turner, Defendant in this case was "cooperative, reviewed and [acknowledged] each admonition of the waiver form, agreed to answer questions, and gave accurate information." Id. Even though the defendant "may have exhibited 'bizarre' behavior and may have exhibited signs of mental illness" at a time other than the interview, "the change in behavior does not show that at the time of his [interview] he lacked the mental capacity to waive his rights." Id. at 556.

Additionally, contrary to Defendant's argument, "his lack of eye contact" and pausing during some answers does not establish that he lacked the mental competence to give a knowing and intelligent waiver—such behavior is not uncommon for any individual being questioned by the police. Moreover, as already discussed above, throughout the interview, Defendant provided responsive answers and grew increasingly more confident and engaged with the agents; he never indicated that he did not understand a question asked of him; and he made no showing that he was confused. Only towards the conclusion of the interview did Defendant become somewhat agitated and begin to repeat himself, which, based on the testimony before the Court, appeared to be related to the denial of his request to write a letter to his wife and the subject matter of the questions posed to him at that time. In the course of the interview, Defendant provided details about how he travelled to Mexico and why he travelled there. Most importantly, when Defendant no longer wanted to answer questions, he specifically said so, at which point the agents stopped the interview. Furthermore, in considering the totality of circumstances, the Court may look to the defendant's "previous interactions with law enforcement." Vinton, 631 F.3d at 483. As the Government highlights, Defendant "has had significant experience with the criminal justice system in light of his significant criminal history," which would suggest that

Defendant is at least somewhat familiar with such police procedures. (Resp. of the United States to the Def.'s Mem. in Supp. to Mot. to Suppress [Docket No. 58] at 9).

After considering the totality of circumstances in this case, which demonstrate both an absence of police coercion and no showing that at the time of the interview Defendant lacked the mental competency to provide a sufficient waiver, the Court finds that Defendant's waiver of his Miranda rights was voluntary, knowing, and intelligent.

## III. CONCLUSION

1. Based on the foregoing, and all the files, records and proceedings herein,

   **IT IS HEREBY RECOMMENDED** that Defendant's motions to suppress evidence and statements [Docket Nos. 28 and 29] be denied.

Dated: April 9, 2012

s/Leo I. Brisbois
LEO I. BRISBOIS
United States Magistrate Judge

**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by April 23, 2012**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.