UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TIMOTHY GLEN CASKEY,<br><br>Defendant. | Criminal No.  11-301 (JRT/LIB)<br><br>**MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE** |

Michelle E. Jones, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600   United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415 for plaintiff.

Caroline Durham, Assistant Federal Defender, **OFFICE OF THE FEDERAL DEFENDER**, 300 South 4th Street, Suite 107, Minneapolis, MN 55415 for defendant.

Timothy Glen Caskey has pled not guilty to charges of kidnapping and interstate domestic violence.  Presently before the Court are Caskey's motions to suppress evidence gathered from the search and seizure of his pickup truck and his property at Merritt House, as well as a motion to suppress statements he made during an interview with Federal Bureau of Investigation ("FBI") agents.  In a Report and Recommendation ("R&R") dated April 17, 2012, United States Magistrate Judge Leo I. Brisbois recommended that the Court deny Caskey's motion to suppress evidence gathered from the search and seizure of Caskey's truck because his Fourth Amendment rights were not violated.  The Magistrate Judge further recommended that the Court deny Caskey's

motion to suppress evidence from the FBI interview because Caskey voluntarily and knowingly waived his Miranda rights. This matter is before the Court on Caskey's timely objections to the R&R. The Court reviews *de novo* those portions of the R&R to which Caskey objects.[1]  *See* 28 U.S.C. § 636(b)(1)(C); D. Minn. L.R. 72.2. The Court will suppress the contents seized from inside Caskey's truck pursuant to an inventory search because the United States has not sufficiently established the policy pursuant to which the property was seized. In all other respects, the Court will deny Caskey's motions.

## BACKGROUND

Caskey is accused of kidnapping his wife R.L.C. in Minnesota on July 14, 2011, and taking her to Mexico. (*See* Compl., Aff. of Jason Hopfer, July 22, 2011, Docket No. 1.) Caskey allegedly drove up next to R.L.C., grabbed her, dragged or pushed her into the cab of his truck, and drove away. (*Id.* ¶¶ 8 -9.) Caskey now seeks to suppress three sources of evidence: a search of his property at Merritt House, a search of his truck in Texas, and an interview of him by the FBI.[2]

---

[1] The Magistrate Judge did not specifically address Caskey's motion regarding Merritt House or Caskey's request to suppress a toolbox allegedly gathered during an inventory search. The parties also have devoted little to no attention to these issues, other than Caskey's raising of them in his motion. The Court will assume that Caskey did not abandon these issues because nothing in the record shows such abandonment and thus will address them in this order.

[2] The Court notes that much of the information in this section is drawn from United States witnesses because Caskey has not set forth an alternative version of the facts.

**I.     SEARCH OF MERRITT HOUSE**

On July 15, 2011, the day after R.L.C. was reportedly kidnapped, the District Court of the County of St. Louis, Minnesota, issued a warrant for "any and all personal property belonging to Timothy Caskey left at the Merritt House." (Hr'g Ex. 3.) The application for the warrant stated that a witness had observed the kidnapping of R.L.C. by Caskey and that Caskey had been living at the Merritt House and stored property there. (*Id.*) A judge found probable cause for the warrant because "the property at the above-described constitutes evidence which tends to show a crime has been committed, or tends to show that a particular person committed a crime." (*Id.*) Caskey alleges that this warrant did not have probable cause.

**II.    SEARCH OF CASKEY'S TRUCK**

Caskey next seeks to suppress his truck and its contents. The United States alleges the following facts related to the search and seizure of the truck: After Caskey kidnapped R.L.C., he drove her first to Texas and then Mexico. While in Texas, on July 16, 2011, Caskey left his truck at a small used car dealership and took another vehicle for a test drive. When Caskey did not return with the dealership's vehicle by closing time, a car salesman, Pete Bornkessel, called the police to report the vehicle stolen. (Transcript of Pretrial Motions Hearing ("Tr.") at 10, Feb. 13, 2012, Docket No. 45.) At approximately 6:30 p.m., Officer Derrick Bobo of the New Braunfels, Texas, Police Department ("NBPD") arrived at the used car dealership. (Tr. 7-8.) Bornkessel told Officer Bobo

that at about 3:20 p.m. that afternoon, a male and a female – allegedly Caskey[3] and R.L.C. – had taken a used vehicle for a test drive, leaving their 1991 Chevrolet 1500 pickup truck with Minnesota license in the dealership's parking lot. (Tr. 8-11, 17.) Bornkessel requested that Caskey's truck be towed from the property. (Tr. 11, 25.)

Officer Bobo ran a check on Caskey's truck. (Tr. 12.) The truck "was flagged as being involved in a kidnapping in Minnesota." (*Id.*) Officer Bobo then contacted his sergeant at NBPD and the police department of Virginia, Minnesota, which had originated the kidnapping report. (*Id.*) Officer Bobo learned, at some point, that the kidnapping victim was a female. (Tr. 15.) After speaking with his sergeant and the Virginia Police Department, Officer Bobo photographed the truck and conducted a vehicle inventory search pursuant to towing the truck. (Tr. 12.)

Officer Bobo did not have a warrant for the search of the truck. (Tr. 23.) However, Officer Bobo testified that he followed NBPD policy when he conducted the search and seizure, (Tr. 18-19), and that NBPD policy requires an officer to fill out a towed vehicle inventory form cataloging "high value items," (Tr. 12-13). Officer Bobo did not define the term "high value items," but he stated that they included cell phones and laptops. (Tr. 12.) Officer Bobo stated that he did not "usually" include anything on vehicle inventory forms apart from items of high value. (Tr. 13.) According to Officer Bobo, the reason that NBPD policy requires creating an inventory of the items in the truck is to establish the chain of custody for high value items and to ensure that they are

---

[3] Bornkessel had a copy of Caskey's Minnesota driver's license, which he made before Caskey took the dealership's vehicle. (Tr. 9, 14.)

returned to the person that owns the vehicle. (Tr. 12.) Officer Bobo did not testify as to what areas of the truck officers could search pursuant to NBPD policy. There is a written policy for NBPD's towing procedure, but it has not been provided to the Court. (Tr. 19.)

Officer Bobo seized a variety of items from Caskey's truck during his search, placing them into evidence at NBPD, and he filled out two separate forms inventorying the property seized. (Tr. 15-16.) First, he filled out a "Towed Vehicle Itinerary" form, listing a black bag, with female clothing inside, and a black camera. (Tr. 14-15, Hr'g Ex. 1.) Then he filled out a "Receipt for Property" form, listing a wooden handled steak knife, two straws from Taco Bell cups, receipts, a camera, a black bag with clothes, fingerprint samples, hair samples, and the 1991 Chevrolet 1500 pickup itself. (Tr. 15-16, Hr'g Ex. 5.) A toolbox does not appear on either the vehicle inventory or the property receipt form, although later police reports indicate that a toolbox was also recovered from Caskey's truck. (*See* Tr. 22, Hr'g Exs. 1 and 5.)

The inventory forms do not indicate the areas in the truck from which Officer Bobo seized all of Caskey's property. During his testimony, Officer Bobo clarified that he seized the black camera from behind the driver's side seat, the receipts from the center console in plain view, the serrated steak knife from under the driver's seat, the hair follicles from the seats on both sides of the truck, and the fingerprint samples from the driver's side of the truck. (Tr. 15.) It is unclear where he gathered the black bag or the toolbox.

Officer Bobo admitted that some of the items he searched for were considered "valuable" only to the police because of their evidentiary value. (Tr. 20, 26.) He testified

that he had the right to gather these items because they were in plain view during his search. (Tr. 26.)

## III.   FBI INTERVIEW

The United States alleges that after stealing the vehicle from KB Auto Sales, Caskey took R.L.C. into Mexico. Mexican authorities apprehended Caskey. At about 4:30 p.m. on August 8, 2011, at the border between Mexico and Texas, FBI Agents Shawn Owen and Paul Sparke, along with U.S. Marshals, took custody of Caskey from Mexican authorities. (Tr. 33-34.) Caskey seeks to suppress statements he made shortly thereafter during an interview with the FBI.

After the FBI brought him into custody, Caskey was handcuffed and placed in a small, windowless administrative office. (Tr. 35-36.) FBI Agents Owen and Sparke conducted an interview of Caskey beginning around 5:20 p.m. (Tr. 37-43.) The agents wore street clothes during the interview and their firearms were concealed. (Tr. 39, 50.)

Agent Owen testified that he saw no marks or bruises on Caskey, but he asked Caskey if he had been mistreated by Mexican authorities. (Tr. 36.) Caskey responded that he was "on medication called Seroquel." (*Id.*) Agent Owen asked Caskey if he was "all right to proceed or if he needed any type of help." (*Id.*) Caskey indicated that he was "all right," causing Agent Owen to presume that Caskey had been merely informing him of the medication. (Tr. 36-37.) Caskey never stated that he currently needed medication. (Tr. 57.)

After this initial exchange, the agents offered Caskey food or drink and use of the restroom. (Tr. 38.) Caskey declined. (*Id.*) The agents then identified themselves as FBI agents, presented credentials and badges to Caskey, and explained that they wanted to talk to him. (*Id.*) The agents next presented Caskey with an Advice of Rights form, outlining his Miranda rights. (Tr. 39-40.) Agent Owen explained the form and read it aloud to Caskey one sentence at a time. (Tr. 41-42.) At the end of each sentence, Agent Owen asked Caskey if he understood. (Tr. 42.) Agent Owen testified that Caskey nodded in response after each line. (*Id.*) At the end of the form, Caskey responded verbally that he understood the waiver of rights and signed the form. (Tr. 42-43.)[4] After Caskey gave the FBI agents his name and social security number, he again informed the agents that he took Seroquel for "various mental disorders, [including] schizophrenia[.]" (Tr. 44, 51.)

At the beginning of the interview, Caskey was calm, demure, and quiet, and responded to the questions asked of him; the agents described him as cooperative. (Tr. 37-38, 45, 56.) Caskey responded to the agents' question with one-word sentences and did not make a lot of eye contact. (Tr. 37.)

In response to questions about R.L.C., Caskey said that voices had told him to "take his wife with him." (Tr. 47.) Caskey further stated that he did not understand why he was in custody. (*Id.*) Caskey never indicated, however, that he was hearing voices

---

[4] The Court notes that Caskey has history with criminal justice system because of his criminal background.

while being interviewed; rather, he appeared lucid and able to understand the questions asked. (Tr. 60-61.)

As the interview continued, the agents testified that Caskey became more confident and agitated and increased his eye contact. (Tr. 38, 48.) His speech patterns alternated between fast and slow, and his leg was shaking. (Tr. 53.) After thirty to forty minutes, Caskey told the agents that he did not want to answer any more questions, and the agents terminated the interview. (Tr. 48-49.)

## ANALYSIS

### I. SEARCH WARRANT FOR MERRITT HOUSE

Caskey first asks the Court to suppress the items found during the search of Merritt House because, he claims, the warrant lacked probable cause. "In the issuance of a Search Warrant, the Fourth Amendment dictates that an impartial, neutral, and detached Judicial Officer, will assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search, or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband." *United States v. Lowen*, No. 10-96, 2010 WL 2653224, at *8 (D. Minn. June 1, 2010). "Probable cause exists where there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Whether probable cause . . . has been established is determined by considering the totality of the circumstances, and resolution of the question by an issuing judge 'should be paid great deference by reviewing courts.'"

*United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (quoting *Gates*, 462 U.S. at 236).

The Court finds that there was sufficient probable cause for a warrant to search Caskey's personal property at Merritt House.[5] A witness allegedly observed Caskey kidnapping R.L.C., and the warrant allowed a search for evidence relevant to this crime. The Court concludes that, from the information in the warrant application, a reasonable person could conclude that evidence of a crime might have been found at Merritt House. Accordingly, the Court will not suppress the evidence seized there.

## II.    INVENTORY SEARCH

The Court must also decide if the search and seizure of Caskey's truck and the items in it should be suppressed. Caskey contends that this search and seizure violated the Fourth Amendment because Officer Bobo conducted the search without a warrant and with the intent to aid the kidnapping investigation of Caskey.

The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U. S. Const., amend IV. Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment, "subject only to a few specifically established and well-delineated exceptions." *United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

---

[5] Indeed, Caskey has not identified why the warrant lacked probable cause.

The United States argues that Caskey's truck was properly searched due to the inventory search exception. This exception "permits law enforcement to inventory the contents of a vehicle that is lawfully taken into custody, even without a warrant or probable cause to search." *United States v. Garreau*, 658 F.3d 854, 857 (8th Cir. 2011). There are three justifications for an inventory search: (1) protection of the owner's property while in police custody; (2) protection of the police from claims of lost, stolen or damaged property; and (3) protection of the police from potential danger. *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998). The crucial question in evaluating an inventory search is "whether, in the totality of the circumstances, the search was reasonable." *United States v. Kennedy*, 427 F.3d 1136, 1143 (8th Cir. 2005).

An inventory search must be conducted pursuant to "**standard police procedures**." *Best*, 135 F.3d at 1225 (emphasis added) (quoting *South Dakota v. Opperman,* 428 U.S. 364, 370 (1976)). Following standardized police procedures vitiates concerns that an inventory search is conducted for an investigatory motive or pursuant to excessive discretion. *United States v. Marshall*, 986 F.2d 1171, 1174-75 (8th Cir. 1993) (holding that inventory search was unconstitutional because it was not conducted pursuant to established procedures); *see also Florida v. Wells*, 495 U.S. 1, 4-5 (1990) (holding that lack of policy with respect to the opening of closed containers during inventory search did not satisfy Fourth Amendment where marijuana was found in a suitcase). The United States bears the burden of producing evidence that impoundment and inventory search procedures were in place and that law enforcement complied with those procedures. *Kennedy*, 427 F.3d at 1144.

"The requirement that officers follow standard procedures in conducting inventory searches does not foreclose the use of some discretion by officers so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *United States v. Hall*, 497 F.3d 846, 851 (8th Cir. 2007) (internal quotation marks omitted). An officer's discretion in conducting an inventory search must be exercised based on legitimate concerns related to the purposes of an impoundment. *Id.*

### A.   Legality of Impoundment

First, the Court finds that Caskey's truck was properly seized and impounded. Officer Bobo decided to tow the truck because it was on private property and there was a request for its tow, not due to an investigatory purpose. Officer Bobo testified that it was department policy to conduct a vehicle inventory search when a private property owner requested a tow, and it is reasonable to assume it was also policy to tow a truck in such circumstances. The impounding of Caskey's truck was thus appropriate. *Id.* at 853 (upholding an inventory search that resulted from a request to tow a truck from private property). The Court further finds that an inventory search of the truck would have been appropriate incident to the tow, if properly conducted. *See id.*

### B.   Legality of Inventory Search

In contrast, because the Court finds that the United States has not met its burden of establishing that Officer Bobo conducted the search in accordance with standard police procedures, it finds that the items seized inside the truck are inadmissible. When

describing the items that officers could seize pursuant to department policy, Officer Bobo did not define the term "high value items." he Court finds that some of the items seized by Officer Bobo – including receipts, hair follicles, and fingerprints – are not "high value items" within the plain meaning of that term. While it is possible that other items seized by Officer Bobo – such as the camera or women's clothing – might qualify as "high value items" pursuant to department policy, the Court cannot make this determination without further information about the policy.[6]

Furthermore, Officer Bobo did not describe the places that department policy allowed an officer to search in a vehicle. It is thus possible that the location of Officer Bobo's search went beyond the policy's dictates. This concern is particularly acute because Officer Bobo did not testify as to where he found each item located in the truck. *See Best*, 135 F.3d at 1225 (holding that an inventory policy allowed for the opening of any opaque containers but did not allow looking inside door panels).

The mere fact that Officer Bobo testified that he complied with NBPD's policy is insufficient to meet the United States' burden; the United States must **define** the policy and demonstrate that Officer Bobo complied with it. *See Kennedy*, 427 F.3d at 1144.

---

[6] Furthermore, the NPBD policy may be unconstitutional if it allows investigation into items of "value" only to the police. "[P]olice 'may keep their eyes open for potentially incriminating items that they might discover in the course of an inventory search, as long as their sole purpose is not to investigate a crime,'" *United States v. Petty*, 367 F.3d 1009, 1013 (8th Cir. 2004) (quoting *United States v. Marshall*, 986 F.2d 1171, 1176 (8th Cir. 1993)), and "the coexistence of investigatory . . . motives will not invalidate the search." *United States v. Wallace,* 102 F.3d 346, 348 (8th Cir. 1996) (internal quotation marks omitted). However, inventory search policies must relate to the purpose of inventory searches, *Best*, 135 F.3d at 1225, and an officer's discretion cannot be exercised for the "sole purpose" of investigating a crime, *Hall*, 497 F.3d at 851.

The United States has not met its burden of producing evidence that proper inventory search procedures were in place and that law enforcement complied with those procedures. *See id*. Accordingly, the Court will suppress the items seized from the interior of Caskey's truck during the inventory search.[7]

### III. FBI INTERROGATION

Finally, Caskey requests that the Court suppress his statements made in the course of the FBI custodial interrogation because, he claims, the waiver of his Miranda rights was not voluntary, knowing, and intelligent. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).[8] There are two distinct aspects of determining whether a Miranda waiver is voluntary, knowing, and intelligent. First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011) (quoting *Moran*, 475 U.S. at 421 (1986)). The United States Supreme Court has explained "that coercive police activity is a necessary predicate to . . . finding that a

---

[7] Caskey specifically seeks the suppression of a toolbox. Although this toolbox is not listed on the inventory search forms filled out by Office Bobo, it appears to the Court that the toolbox – the contents of which were apparently later searched pursuant to a search warrant – was seized as part of Officer Bobo's inventory search. Accordingly, the Court will suppress the toolbox. *See United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012) ("[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'").

[8] Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may this Court properly conclude that the defendant's Miranda rights have been waived. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). The United States has the burden to establish, by a preponderance of the evidence, that a Miranda waiver was valid. *United States v. Boslau*, 632 F.3d 422, 429 (8th Cir. 2011).

confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *see also United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002).

Regarding this first element, the Court finds that Caskey's statements were voluntary. The evidence does not establish FBI coercion; instead, prior to the FBI's interview, the agents asked Caskey if he had been mistreated while in Mexican custody, searched him for signs of physical mistreatment, asked if he needed food, drink, use of a restroom, or any type of help, and gave him the choice to proceed with questioning. There is no evidence that Caskey had been mistreated by the Mexican government prior to questioning or that the FBI agents believed he had been mistreated. Furthermore, the fact that Caskey was in handcuffs is insufficient to demonstrate that the interrogation was involuntary, *see United States v. Robinson*, 20 F.3d 320, 322-23 (8th Cir. 1994), as is the fact that the room was small, *see United States v. Goodale*, No. 12-3011, 2012 WL 1965600, at *4 (N.D. Iowa May 31, 2012). Considering the totality of the circumstances, including Caskey's explicit waiver of rights, the relatively short time period of the interrogation, and the absence of any allegation of specific coercive action, the Court finds that Caskey's waiver was voluntary. *See Vinton*, 631 F.3d at 483 ("Even if a suspect has a somewhat diminished capacity to resist coercion due to a mental defect . . . a *Miranda* waiver will not be invalidated on that basis if there is no evidence of police coercion.").

The second aspect of Miranda inquiry is whether Caskey knowingly and intelligently waived his rights. *Id.* The Eighth Circuit has held that that police coercion has no bearing on the question of whether a waiver was knowing and intelligent. *United*

*States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998).[9]  Thus, this prong looks not to police coercion but to whether the defendant had "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Id.* (quoting *United States v. Jones*, 23 F.3d 1307, 1313 (8th Cir. 1994)).

The Court finds that Caskey was capable of knowingly and intelligently waiving his Miranda rights because he displayed signs of understanding when he waived his rights, responded appropriately to questions, and demonstrated mental competence throughout the interview.  The record is devoid of any details regarding Caskey's mental health that would lead the Court to conclude that he lacked the capacity to knowingly and intelligently waive his rights, and Caskey's mental health diagnosis alone is insufficient to establish that his confession was involuntary.[10]  *See id.* at 556 (holding that, although the defendant may have later exhibited "bizarre" behavior associated with mental illness, the change in behavior did not show that at the time of his confession he lacked the mental capacity to waive his rights).  Considering the totality of the circumstances, the Court will not suppress the FBI's interview with Caskey.

---

[9] *See also United States v. Edwards*, 563 F. Supp. 2d 977, 1002 (D. Minn. 2008); *United States v. Herrera*, 2007 WL 1542553, at *2 (D. Minn. Apr. 10, 2007).

[10] As noted above, Caskey began the interview with one-word sentences and a lack of eye contact.  As the interview progressed, his speech patterns alternated, he avoided certain questions, he became more agitated, his eye contact increased, and his leg was shaking.  Caskey objects to the R&R's conclusion that this behavior was normal in an interrogation as unsupported by the record.  The Court notes, however, that there is also no information in the record indicating that this behavior demonstrates a lack of capacity.  The Court finds that Caskey's behavior was not so unusual to suggest a lack of capacity, and that, given the totality of the circumstances, the United States has met its burden of establishing a voluntary, knowing, and intelligent waiver.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, the Court **SUSTAINS in part** and **OVERRULES IN PART** defendant's objections [Docket No. 67] and **ADOPTS in part and REJECTS in part** the Report and Recommendation of the Magistrate Judge dated April 17, 2012 [Docket No. 62]. Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 29] is **GRANTED in part** and **DENIED in part, as follows**:

    a. Defendant's motion to suppress the seized truck titled to him is **DENIED**.

    b. Defendant's motion to suppress the contents of the truck seized during the inventory search is **GRANTED**.

    c. Defendant's motion to suppress the property at Merritt House is **DENIED**.

2. Defendant's Motion to Suppress Statements, Admissions and Answers [Docket No. 28] is **DENIED**.

DATED: July 25, 2012　　　　　　　　　　　　s/ John R. Tunheim
at Minneapolis, Minnesota.　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　　　United States District Judge